# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs August 5, 2014

## O'NEAL JOHNSON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 08-05474      Chris Craft, Judge**

---

**No. W2013-02313-CCA-R3-PC  - Filed October 21, 2014**

---

The petitioner, O'Neal Johnson, appeals the post-conviction court's denial of his petition for post-conviction relief, arguing that he received the ineffective assistance of counsel. After review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and ROGER A. PAGE, J., joined.

Andrea Sipes Lester, Jackson, Tennessee (on appeal); and Randall Rhea, Memphis, Tennessee (at hearing), for the appellant, O'Neal Johnson.

Robert E. Cooper, Jr., Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Alexia Crump, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

The petitioner was convicted of rape of a child and sentenced to twenty-five years at 100% as a violent offender. State v. O'Neal Johnson, No. W2010-00405-CCA-R3-CD, 2010 WL 4812770, at *1 (Tenn. Crim. App. Nov. 19, 2010), perm. app. denied (Tenn. Apr. 18, 2011). This court affirmed the judgment of the trial court on direct appeal, and the Tennessee Supreme Court denied his application for permission to appeal. Id. The underlying facts of the case were recited by this court on direct appeal as follows:

In December 2007, the twelve-year-old victim . . . discovered that she

was pregnant as a result of the [petitioner]'s sexually penetrating her during the months of April to October 2007. For his actions, the [petitioner] was indicted on one count of rape of a child.

### State's Proof

At trial, the victim testified that the [petitioner] lived with her and her mother, her younger sister, and her two younger brothers during the period of April to October 2007. The victim recalled that during that time period, when they were residing at a house on McCrory Avenue and later Appian Cove, the [petitioner] "touch[ed] [her] in the wrong spot." She elaborated that the [petitioner] touched her "[i]n [her] private parts" or vagina, and he did so on more than ten occasions. The victim shared a bedroom with her sister, and the [petitioner] picked her up out of bed, took her to the living room or kitchen, laid her on the floor, and "pull[ed] [her] pants down." Once the [petitioner] took the victim's pants off, he had the victim get on her hands and knees and stuck his penis "[i]n the back." The victim clarified that the [petitioner] put his penis in her vagina. The victim said that to the best of her knowledge, the [petitioner]'s penis did not go into any other part of her body. She said that "[i]t hurt[ ] . . . [e]verywhere below [her] waist" when the [petitioner] did this to her. The victim said that she never struggled with or told the [petitioner] "no" because "he said if [she] ever t[old] he would threaten to kill [her] and [her] momma," which made her feel sad and scared. The [petitioner] never threatened to harm himself.

The victim testified that up until October 1, 2007, the [petitioner] was the only person who had ever touched her vagina with a penis. In December 2007, the victim was visiting with her aunt and cousin when they "noticed that [her] stomach was starting [to] get[ ] big." After taking a pregnancy test, the victim admitted that the [petitioner] had touched her, but her mother did not believe her. The victim gave birth to a full-term baby on March 31, 2008.

On cross-examination, the victim testified that she recalled giving a statement at the Child Advocacy Center on January 2, 2008, in which she said that the [petitioner]'s penis went in her "butt." However, she said that she told the interviewer that the [petitioner] had put his penis in her vagina, but she did not think the interviewer wrote that down. She also acknowledged that she told the Child Advocacy Center that the [petitioner] had threatened to kill himself, not her or her mother, if she told.

The victim's sister . . . testified that she was currently thirteen years old. During the time period of April 1 to October 1, 2007, the [petitioner] was her mother's boyfriend and resided with their family. On an occasion when the group was living in a house on Appian Cove and her mother was at work, [the victim's sister] and her two brothers were watching a movie in her mother's bedroom, when [the victim's sister] walked toward the kitchen and "saw [the victim] on her hands and knees." The victim had her school uniform on, but her pants and underwear were down below her knees. Someone was holding his hand over the victim's mouth and using his other hand to pull back the victim's hair. [The victim's sister] assumed that the hands belonged to the [petitioner] "[b]ecause he was the only man in [their] house" at the time. The victim buttoned and zipped her pants and the man zipped his pants, and [the victim's sister] asked the victim what was going on. A voice [the victim's sister] recognized as the [petitioner]'s said, "Nothing." [The victim's sister] asked the victim to start another movie for them, and the victim told the [petitioner] "to go put on another movie" and he did. [The victim's sister] said that she had seen the [petitioner] with a gun "[m]any times" and that he kept it in a drawer in her mother's bedroom. [The victim's sister] stated that she was scared of the [petitioner].

The victim's older cousin testified that in December 2007, she noticed that the victim's stomach "looked a little big . . . for her age." [The victim's cousin] and her mother purchased a pregnancy test and assisted the victim in taking it, and it returned a positive result. The victim admitted to her cousin that the [petitioner] had been touching her.

Eddie Scallions, an investigator with the district attorney's office, explained the process for collecting specimens for a "rape kit" and testified that he collected buccal swabs of the [petitioner]'s DNA and turned them over to Larry Eaves, another investigator in the district attorney's office.

Thomas Shouse, an investigator with the district attorney's office, obtained buccal swabs of the victim's DNA and turned them over to Larry Eaves.

Larry Eaves testified that he collected buccal swabs of the DNA of the victim's baby and transported the swabs, as well as the swabs collected by the other investigators, to Orchid Cell Mark Laboratory for testing.

Dr. Deborah Cutter, laboratory director of Orchid Cell Mark Laboratory

in Nashville, was accepted as an expert in microbiology and DNA. Dr. Cutter explained that individuals receive a combination of DNA from their mother and father, and she described the process for establishing paternity. Dr. Cutter testified that she analyzed the samples obtained in this case, and the [petitioner] could not be excluded as the baby's father. Moreover, she determined that the "probability of paternity" was 99.99 percent, "which is [their] highest reportable probability."

### [The Petitioner]'s Proof

The [petitioner], via undirected narrative, testified that he started living with the victim's mother and her children in 2005, and they were romantically involved. Over the years, they resided in an apartment and three different houses together, moving first to "get [the children] in a better environment" and then to get the children in a better school. The [petitioner] recalled an incident when the victim's mother allowed her uncle to babysit the children when the victim was twelve years old. The [petitioner] was concerned because the uncle was "drunk and talking out of his head," but the victim's mother believed the children would be all right. The [petitioner] and the victim's mother went to a movie and returned home around 11:30 p.m. to find the uncle asleep on the sofa and the children asleep on the floor in front of the sofa.

The [petitioner] testified that he and the victim's mother walked to their bedroom, and then he returned to the living room to find the victim lying on the couch next to the uncle with "her whole shirt . . . off, breast exposed" and the uncle "was playing asleep." After having the uncle leave, the [petitioner] talked to the children about inappropriate touching, and he and the victim's mother decided to keep the uncle away from their house. However, the uncle periodically came by to bring items to the victim, so they moved again to get further away from the victim's mother's family.

The [petitioner] testified that they later "decided to upgrade" and moved to a house in the county. In mid-December 2007, the [petitioner] was arrested for an unrelated incident and, while incarcerated, received notification that he had been indicted for the sexual child abuse of the victim. Several months later, the [petitioner] was released from jail, and he relayed the normal events in the household, including caring for the victim's new baby, until the children were removed from their home. He was later arrested on the indictment in this case. The [petitioner] denied having sexual relations with the victim.

-4-

Id. at *1-3 (footnote omitted).

The petitioner filed a *pro se* petition for post-conviction relief and, after the appointment of counsel, two amended petitions were filed. On appeal, the petitioner confines himself to arguing that counsel was ineffective for failing to request an expert to review the State's DNA evidence, failing to properly investigate potential exculpatory witnesses, and failing to prepare a proper motion for new trial which prejudiced him on direct appeal. We will, thus, confine our summary of the evidentiary hearing to testimony that is relevant to those issues.

At the evidentiary hearing, the petitioner testified that he told counsel that he did not have sexual intercourse with the minor victim. He denied being the father of the victim's baby. He said that he told counsel that the victim's mother told him that the victim's uncle had sex with the victim, so he asked counsel to call the victim's mother and uncle as witnesses at his trial. However, the victim's mother and uncle were not called as witnesses.

On cross-examination, the petitioner elaborated that it was in October 2008, after he was arraigned, when he told counsel that the victim's mother had told him that the victim's uncle had sex with the victim and could possibly be the father of the victim's baby. He said that he also asked counsel to call Ms. Bledsoe from the Child Advocacy Center, who was "familiar" with his allegation that the victim's uncle had had sex with the victim, but counsel did not call her. The petitioner denied telling counsel that he had consensual sex with the victim.

The petitioner testified that he was "swabbed" twice for DNA testing. He believed that the first test result was "96-something" positive that he was the father of the victim's baby, and the second test was 99% positive. He acknowledged that 99.95% sounded like the actual result.

The petitioner testified that counsel visited him in jail "[a] few" times, and they met three or four times in the courtroom before his trial was set. He claimed that after his trial was scheduled, he did not see counsel for six months before the trial date. He said that, on the day of trial, counsel gave him "the statements from the [Child] Advocacy Center."

The petitioner acknowledged that he discussed his trial strategy with counsel but said that counsel did not use the strategy that he wanted and had him testify in narrative form. The petitioner denied that he told counsel different versions of what occurred. He said that he and counsel got into an argument, and counsel tried unsuccessfully to withdraw from representation. He claimed that counsel accused him of impregnating the victim. The petitioner acknowledged that he told counsel that the victim was sexually active with her

uncle and "a little boyfriend."

The petitioner admitted that he dated the victim's mother and shared a house with her and her children. The petitioner testified that he wanted the victim's mother to testify at trial that the victim's uncle or the victim's boyfriend could have impregnated the victim. He claimed that the victim told her mother that the uncle or boyfriend could have been the father. The petitioner admitted that he never wrote letters to counsel asking him to take certain actions.

Counsel testified that he represented the petitioner and was aware that the State intended to introduce DNA evidence at trial. He did not request that a DNA expert be appointed to assist in the petitioner's defense because the petitioner never denied paternity to him, and counsel did not believe that there were any grounds upon which to request one. Counsel said that he was familiar with the buccal swab process for DNA testing. He examined the envelopes that were sent to Orchid Cellmark laboratory for testing, and he had access to the DNA reports from the juvenile court. He found nothing suspicious about the evidence or reports and again noted that the petitioner never denied paternity. In fact, counsel recalled that, at the sentencing hearing, the petitioner said, "I love my baby." Counsel reviewed the curriculum vitae of the expert who testified about the DNA results, and he determined that she worked for a reputable organization that various governmental agencies across the state use. Counsel testified that he reviewed the DNA reports and sent copies to the petitioner. The DNA test that was sent to Orchid Cellmark returned with a finding that there was a 99.95% likelihood that the petitioner was the father of the victim's baby. Counsel noted that laboratories never claim that DNA results are a perfect match, but instead give statistical probability.

Counsel testified that he raised the issue of sufficiency of the evidence in the motion for new trial. He acknowledged that the motion was boilerplate but that he filed it to ensure that it was timely and was able to amend it later if necessary. He reviewed the notes that he and co-counsel took at trial in an attempt to find additional grounds to raise, but he did not find any further grounds to include in the motion. He acknowledged that, although he objected at trial to the victim's sister's testimony about the petitioner owning a gun, he did not raise the issue in the motion for new trial because the basis of the objection was to prevent evidence relating to the petitioner's separate attempted murder charge from being introduced. Counsel also did not raise in the motion for new trial the trial court's denial of his request for an instruction on the lesser-included offense of attempted rape of a child. He explained that the court declined to give the charge because the rape was completed, and the trial court cited to a supreme court case as the basis for its determination.

Counsel testified that he reviewed the State's file, including notes from interviews of

the victim and her sister and materials from the Memphis Sexual Assault Resources Center. He requested that a female investigator be assigned to the case. The investigator interviewed the victim's mother, who had lost custody of her children. The children's guardian would not permit the investigator to interview the children. Counsel did not think that the victim's mother would make a favorable witness for the petitioner because she acted nonchalant about the rape and subsequently lost custody of her children.

Counsel testified that he met with the petitioner at least sixteen times in preparation for trial. Their working relationship was very cordial at first but grew "a little more contentious" as they got closer to trial. During one of their visits, the petitioner told counsel that he had engaged in consensual sex with the victim on one occasion. Counsel recalled that he explained to the petitioner that the victim could not consent because she was less than thirteen years of age, even if she had initiated the sexual intercourse. Counsel stated that he informed the petitioner that, even if the victim was promiscuous, "that had nothing to do with the fact that the DNA came back" 99.99% in one test and 99.95% in another test, finding that the petitioner fathered the victim's baby. Counsel said that he did not recall seeing the victim's uncle's name in his file.

On September 3, 2013, the post-conviction court entered an order denying the petition for post-conviction relief. As to each of the petitioner's allegations relevant to this appeal, the post-conviction court found that the petitioner failed to show that counsel rendered deficient performance or that any alleged deficiency caused him prejudice. The court found that the petitioner offered no proof that there was anything improper about the DNA evidence in the case, or that any particularized need could have been shown in order to request funds for the assistance of such expert; that the petitioner failed to call the witnesses to testify at the evidentiary hearing that he claimed counsel was ineffective for failing to have called; and that there was no merit to any of the issues the petitioner complained were not preserved for appeal.

## ANALYSIS

On appeal, the petitioner argues that counsel was ineffective for failing to request an expert to review the State's DNA evidence, failing to properly investigate potential exculpatory witnesses, and failing to prepare a proper motion for new trial which prejudiced him on direct appeal.

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d

497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). Moreover, the reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S.

at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

## DNA Expert

The petitioner first argues that counsel was ineffective for failing to request the services of a DNA expert. He asserts that, because the tests from Orchid Cellmark and the juvenile court varied "slightly," counsel should have requested a defense expert to analyze the DNA tests. Counsel testified that one of the DNA tests returned a result showing a 99.99% likelihood that the petitioner was the father of the victim's baby, and the other test determined that there was a 99.95% likelihood that he was the father. Counsel also testified that the petitioner never denied paternity. Counsel stated that he reviewed the DNA reports and found nothing suspicious about the evidence or the qualifications of the State's expert. The evidence shows that counsel made a tactical determination not to request a DNA expert based on his review of the evidence and the fact that the petitioner never denied that he was the father of the victim's baby. Moreover, the petitioner failed to offer proof that there was anything improper about the DNA evidence or that a particularized need could have been shown to request funds for a DNA expert. The petitioner has failed to show that counsel performed deficiently or that any deficiency caused him prejudice.

## Investigate Witnesses

The petitioner next argues that counsel was ineffective for failing to investigate potential exculpatory witnesses, namely the victim's mother and uncle. He asserts that the testimony of the victim's mother and uncle could have supported the theory of the case that the victim's uncle was the one who "had sexual relations with and impregnated [the victim]." Counsel testified that his investigator interviewed the victim's mother. Counsel did not think that the victim's mother would make a favorable witness for the petitioner because she acted very nonchalant about the rape and subsequently lost custody of her children. Counsel testified that he did not recall seeing the victim's uncle's name in his file.

The petitioner failed to present the victim's mother or uncle as witnesses at the evidentiary hearing. As the post-conviction court explained, "This court has no idea of the substance of [the victim's uncle's] proposed testimony, or whether he would have admitted or denied having any sexual contact with the victim at any period of time." In order to succeed on a claim that counsel did not properly investigate or call favorable witnesses at trial, a petitioner must generally elicit favorable testimony from those witnesses at the evidentiary hearing, as a post-conviction court may not speculate "on the question of . . . what a witness's testimony might have been if introduced" at trial. Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Furthermore, the petitioner ignores the fact that

-9-

two DNA tests determined to a near certainty that he was the father of the victim's baby, and he does not explain how proof that the victim's uncle might have had sexual contact with the victim would negate the clear DNA evidence. Moreover, counsel testified that the petitioner never denied paternity of the victim's baby to him. The petitioner has failed to prove that counsel performed deficiently or that any deficiency caused him prejudice.

### Motion for New Trial

The petitioner lastly argues that counsel was ineffective for failing to raise issues other than sufficiency of the evidence in his motion for new trial, which prejudiced him on direct appeal. However, in his brief, the petitioner fails to specify which other grounds he believes should have been raised and why those issues would have been meritorious. Counsel testified that he reviewed both his and co-counsel's notes from trial and found no other viable issues to raise in the motion for new trial as his reasoning for relying on a standard challenge to the sufficiency of the evidence. The petitioner has failed to prove that counsel performed deficiently or that any deficiency caused him prejudice.

### <u>CONCLUSION</u>

Based on the foregoing authorities and reasoning, we conclude that the petitioner has not met his burden of showing that he was denied the effective assistance of counsel. Accordingly, we affirm the denial of the petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE

-10-